Trussell *v.* Trussell, Appellant.

Argued November 2, 1934.

Before TREXLER, P. J., KELLER, CUNNINGHAM, BALDRIGE, STADTFELD, PARKER and JAMES, JJ.

*E. S. Richardson,* of *Middleton, Blakely & Richardson,* for appellant.

*Milford J. Meyer,* and with him *Eugene John Lewis,* for appellee.

OPINION BY KELLER, J., March 1, 1935:

This is an action of divorce brought by a husband against his wife on the ground of wilful and malicious desertion. The libel was filed May 5, 1928. It fixed April 21, 1926 as the date when respondent's wilful and malicious desertion began and averred that it had continued from that time to the date of bringing the action. The respondent, who had been served with the libel in Philadelphia on June 18, 1928, appeared and answered, and denied that on the date alleged in the libel, or any other date, she had deserted the libellant. The case was referred to a master, who, on August 28, 1929, filed a report recommending a divorce. Exceptions filed by the respondent were argued, and on July 13, 1931 the exceptions were dismissed and the report of the master approved. On July 2, 1934 the final rule for divorce was made absolute and a decree was entered divorcing the libellant from the respondent. The respondent appealed. We recite these dates in order that it be understood that the delay in the case has not been in this court.

We have read and re-read with care the evidence in the case, and, giving due consideration to the fact that the master saw the witnesses who testified, we are still unable to agree with the findings and conclusions of the master and the court below. In our opinion the undisputed evidence in the case, in connection with documentary and other evidence, which is persuasive to us, requires a finding that the libellant did not establish a wilful and malicious desertion by his wife, and a consequent decree dismissing the libel. As our

594

judgment runs counter to that of both the master and the court below we shall set forth our reasons at more length than we would otherwise deem necessary.

The parties were married at Baltimore, Maryland, on April 29, 1911. The libellant was a newspaper man, who worked on a Baltimore paper. They lived together in that city until 1914. That year they moved to Philadelphia, where he was employed on a paper. In 1917 they went back to Baltimore and between that year and 1923 he worked in Baltimore, Washington, D. C., and Newark, N. J. In 1923 he came back to Philadelphia, where he worked on the Evening Public Ledger. On March 1, 1925 he went to New York and stayed there until April 20, 1925. Then he came back to Philadelphia where he worked until September 1, 1925. Then he returned to New York where he stayed from September 1, 1925 until April 1, 1926. During this time he was taken sick with pneumonia and then lost his job—was discharged in February, 1926. On April 1, 1926 he returned to Philadelphia. We have gone into these matters in some detail, although they are not *directly* pertinent to the issue,—notwithstanding so much of libellant's testimony was taken up with their recital—for a reason which we shall now state.

On April 30, 1926 he filed a libel to No. 5 June Term, 1926 in the Court of Common Pleas No. 5 of Philadelphia County, alleging that his wife had wilfully and maliciously deserted him on September 21, 1923 and had continued in such desertion "from thence hitherto." Yet he admitted on the hearing in the present case that his wife had lived with him in Philadelphia and New York in 1923, 1924 and 1925, and they had had marital intercourse together during those years, while she was with him. He admitted that her mother was very sick in Baltimore in the spring of 1925—she died that summer—and that when he was sick with pneumonia in January or February of 1926, at the

Hotel St. George, Brooklyn, she had come on from Baltimore to nurse him and stayed with him for several weeks, and, when she left, had borrowed the money to pay his hotel bill, as he had lost his job. The first libel was dismissed on November 15, 1927, for want of prosecution, the libellant giving as his reason that he had learned that his having marital intercourse with his wife prevented his obtaining a decree. It is true that in his admissions that his wife lived with him in 1923, 1924 and 1925 he stated—which she emphatically denied—that she lived with him 'when it suited her,' or 'for a short time,' or 'about half the time,' for certain periods, and spent the rest of her time in Baltimore, but it cannot be denied that, according to his own story, while she may have divided her time between Philadelphia and Baltimore and spent more of her time in the latter place than he wanted her to, there was no desertion up to April 1, 1926. And yet he swore, in his libel, filed April 30, 1926, that she had wilfully and maliciously deserted him since September 21, 1923, when his own testimony showed they had lived and cohabited together as husband and wife at frequent intervals, from that time up to at least September, 1925. It will not do to attempt to explain this departure from the truth by saying that he did not understand what was meant by desertion. He is a man whose life has been spent in newspaper work, which requires more than ordinary intelligence and acuteness of understanding. He had counsel who knew the law and what was necessary in order to obtain a divorce on the ground of wilful and malicious desertion. To hold that, when he prepared and filed his libel, alleging a wilful and malicious desertion for over two years, wholly contrary to fact, and covering long periods when she lived with him as his wife, as well as times when she was nursing her sick mother, and when he was without a job and unable to give her

a home, he did not know what the language used meant is too much for our credulity.

It shows rather that, on April 30, 1926, he was trying to divorce his wife, and in order to get a divorce was willing to make accusations against her which he knew were false.

This becomes material when we consider his evidence as respects the second libel, the present one.

He testified that on April 16, 1926 he called at her home in Baltimore, and asked her to come and live with him in Philadelphia. He denied having any recollection of having had intercourse with her that day, but said, as she claimed he had, he would not dispute it. He subsequently did dispute it. He did not tell her that he intended to bring an action of divorce within two weeks; he could scarcely have done so for he knew that she had not deserted him. She testified to his call on her at Baltimore on this date and that he had had intercourse with her that day. She denied that he asked her to live with him on that occasion, and said he told her he was not making enough money to have her with him; that when he did he would let her know and send for her; which he never did.

He testified that he made frequent attempts to get his wife to come and live with him and that she refused and said she would live no place but in Baltimore and that he should move there and get a position on a paper there. But it is clear, from his later testimony, that he was referring to a time prior to April 16, 1926. Hers is diametrically opposite—that she was willing to go wherever he wanted her to; but he did not want her with him; that she wrote to him frequently asking him to let her come and he did not answer her; that he told her he was living in bachelor quarters with two other young men on the paper and that he could not afford to set up housekeeping with her. When they were together in Philadelphia, they had lived part of

the time in one room in a rooming house. He produced only two letters from her during that two year period. She had learned of the first divorce action and she was bitter in her comments about his course in that respect and the advice that led him to take it, but neither of the letters contain anything that could be construed as a refusal to live with him. In them she denied ever having deserted him or given him cause for taking such action. On the other hand she produced a few letters from him, which were excuses for not sending her more money, because he did not yet have a paying job. In none of them was there a request that she should join him, even when his financial affairs got better.

While a great deal of libellant's testimony was devoted to matters which occurred before April 1, 1926, it is really not very relevant or material, if at all, in this case. His own evidence and admissions conclusively rebut any desertion by the respondent prior to April 1, 1926. Unlike cruel and barbarous treatment and indignities to the person, alleged acts of desertion cannot be tacked on to alleged prior desertions, if they are broken or separated by the parties living together in the family relation, however brief such period may be. To be effectual as a cause for divorce in this State the desertion must not only be wilful and malicious, but must be continuous and uninterrupted for two years. The fact that the respondent, on learning of libellant's illness in New York, went to his bedside, nursed him to convalescence and borrowed the money to pay his hotel bill,—he having lost his job and being without means—which libellant admitted, conclusively rebuts any desertion by her beyond that time. At that time he had no job, no money except such as was lent him by friends, no place where he could live with his wife and support her. Her leaving him, in such circumstances, was not an act of desertion. Whether her

subsequent conduct was such as would justify a finding of desertion depends on the conduct of both parties thereafter. As he had no home in which to live with her and no means of supporting her at the time she went back to Baltimore, her leaving must be held to be with his acquiescence, if not a matter of necessity, and based on 'reasonable cause'; and before her absence from him would become a desertion there must have been a bona fide request from him to her to return and live with him, made when he had a place in which to live with her and means with which to support her; and, to justify a divorce in his favor, he must have been ready and willing to have her come back to him during the entire two year period. If during that time he expressed to her his reluctance or unwillingness to have her live with him, her subsequent remaining away would be excusable and not a wilful and malicious desertion.

While he asserted such willingness he testified, (p. 53a), that the *last* time he asked her to come back and live with him was in Baltimore on April 16, 1926. None of his letters during the two year period following April 21, 1926, the date fixed in the libel as when her desertion began, contains a single request, or any language indicative of a wish or desire on his part that she should come and live with him. They were rather excuses for not doing more for her, because of his lack of money. None of her letters to him during the same period, which he produced, contains a refusal to go to live with him, if he asked her and had the means to keep her. She testified that during this time she wrote innumerable letters asking him to let her live with him and that he ignored them all. It is undisputed that when she learned of the first divorce action she tried, both by letter and in person, to get him to withdraw it; that she came to see him, at his office in a Camden, N. J., newspaper where he was then working,

in an endeavor to persuade him to do so. Her letters complain of the dishonesty of the charge and the insincerity of the action, but contain no word of refusal to live with him and be a wife to him.

On the other hand, all his testimony as to his constant endeavor to get her to come and live with him, must, in the light of his evidence on page 53a, have referred to times and periods before the date of her alleged desertion on April 21, 1926. Nine days later, it will be remembered, he filed his first action in divorce averring that she had wilfully and maliciously deserted him over two years before, to wit, September 21, 1923. It is highly improbable, in our opinion, that a man who had brought an action of divorce against his wife, charging her with having wilfully and maliciously deserted him two and a half years before, and that such desertion had continued without interruption,—which charge he admitted in these proceedings to be false, and that his wife had joined him at 1028 Pine St., Philadelphia in September, 1923 (p. 46a); that they lived there "intermittently" until May 1, 1924, (p. 46a) and then went to the St. James Hotel, where Mrs. Trussell lived with him "part of the time" (47a); that between April 20, 1925 and September 1, 1925 she spent about half her time with him in Philadelphia (49a); and that she was with him at least several weeks at the time of his illness in New York in January or February, 1926 (p. 52a)—that a man who would do this, and who, despite her protests and entreaties, kept this groundless divorce action alive until November 15, 1927, had any real wish or desire to have his wife live with him, or made any sincere, bona fide request to her to do so. His actions speak louder than words. What he *did*, between April 30, 1926 and November 15, 1927, speaks so loud that it drowns what he now *says* about his wishes and desires during that period.

One thing more helps to convince us of the unreliability of libellant's testimony and the truthfulness of his wife's story.

She testified that on August 12, 1927, when she came to Camden, N. J., to try to induce him to withdraw the first divorce action and resume marital relations, he went with her that evening to the Hotel Vendig, Philadelphia, where they spent the night together in room 801, and had marital intercourse. He admitted going with her to the Walt Whitman Hotel for dinner and putting her on the Ferry, but denied staying at the Hotel Vendig with her that night. It is proper to note that in her letter of February 24, 1928, which *he* produced in evidence, she said: "It has been more than six months [6 months and 12 days] since I was with you at the Vendome [a mistake, she says, for Vendig] and when you left me at Broad Street Station, you said you would see how things went up there before sending for me—and in all this time I have not had one word from you." He made no explanation whatever of this statement; did not aver that he ever wrote denying its truth.

The register of the Hotel Vendig for August 12, 1927 was produced and it showed that 'Mr. & Mrs. R. F. Townsend, Wash., D. C.' had registered that night and been assigned to room 801. The similarity between this signature and his admitted handwriting is remarkable. The learned President Judge of the court below admitted that the handwriting on the register looks similar to the libellant's. An expert on handwriting, of long experience, testified they were written by the same person. His capital T's are distinctive; one might almost say, unique; and the similarity in writing M, Mrs., a, d, h, n and o, all of which letters appear in both writings, and the relative size of the capital M's and T's, the latter being twice as tall as the M's, the angle of writing, and other points of like-

ness lead us to believe that the entry in the hotel register was written by him. We are not impressed by the testimony of libellant's expert that Mrs. Trussell wrote the entry in the Hotel Vendig register. There is no real similarity between it and her admitted writing; and the signature on the Hotel Vendig register is not a simulated one. It is too free and natural.

Why should he resort to this course? It is not difficult to surmise. He admitted that he knew that having marital intercourse would stop the desertion; that it had been explained to him by counsel that in order to constitute desertion there must be no intercourse (p. 62a). His first action was subsequently discontinued because he had lived with his wife between September, 1923 and April, 1926. If he signed this register, 'Mr. & Mrs. P. L. Trussell,' he could not hope to get a divorce for at least two years thereafter, no matter what he might say. By registering in the name of Mr. & Mrs. R. F. Townsend he could deny the marital intercourse, and assert a continuance of an alleged desertion. We are satisfied that he wrote the entry in the hotel register and that he occupied room 801 at the Hotel Vendig with the respondent that night.

The court below was of opinion that even if they occupied the room together at the Hotel Vendig and had marital intercourse together that night, it would not amount to a break in the desertion, citing Ulizio v. Ulizio, 96 Pa. Superior Ct. 91, 100, and Danforth v. Danforth, 88 Me. 120, 33 A. 781.

We have already said that, in our opinion, there was no desertion of the libellant by the respondent; that she did not live with him because he did not want her to. But in addition to this, it is well established that when the alleged deserting wife comes to her husband and has marital intercourse with him, that breaks the continuity of the desertion. In the Ulizio case we did not rule the case against the husband because of

the act of marital intercourse, which was disputed, but held that he was not entitled to a divorce because his wife's desertion was not clearly proved. We referred in that connection, to the case of Danforth v. Danforth, supra, where the Supreme Judicial Court of Maine held that the continuity of desertion was not broken by the fact that the *deserted husband went to the home of the deserting wife* and attempted to persuade her to return to him, and that she refused, but had intercourse with him once, notwithstanding such refusal. That case followed Kennedy v. Kennedy, 87 Ill. 250, where the facts were very similar, and the same ruling was made, but in the latter case the court said: "Had she gone to his house and they had so cohabited, then there would have been an entirely different question" (p. 254).

These decisions have been questioned, (Burk v. Burk, 21 W. Va. 445) and not followed in other jurisdictions: LaFlamme v. LaFlamme, 210 Mass. 156, 96 N. E. 62; 39 L. R. A.—N. S.—1133 and note; Gaillard v. Gaillard, 23 Miss. 152; Woolfolk v. Woolfolk, 96 Ky. 657, 29 S. W. 742; Reed v. Reed, 62 Ark. 611, 37 S. W. 230; Tracey v. Tracey, 43 Atl. 713, 714, (N. J. Eq.); Phinizy v. Phinizy, 114 S. E. 185 (Ga.). See also Phelan v. Phelan, 135 Ill. 445, 25 N. E. 751; 19 C. J. 87, sec. 201(d); 9 R. C. L. 362, sec. 148 (note 14); 9 R. C. L. 385, sec. 177 (notes 2, 3). We are of opinion, that even if the evidence showed a desertion of the libellant by respondent prior to August 12, 1927, which we find not to be the case, their living together and having marital intercourse at the Hotel Vendig, when she came up from Baltimore to see him and induce him to withdraw the pending divorce action, would break the continuity of the desertion and bar this divorce, because it is not claimed that he ever asked her to live with him after August 12, 1927. The law is settled that two alleged periods of separation cannot be added

together to secure a divorce for desertion: Luper v. Luper, 96 Pac. 1099 (Ore.); Nelson on Divorce, sec. 91 1895). The law will not permit a party to assert an intention contrary to the result of his action.

It is not necessary to refer to other matters which might be urged with additional force against the decree appealed from—e. g., the visit to her room at Green's Hotel, Philadelphia, on Saturday, June 16, 1928, after the libel in suit had been filed, but before it had been served; the service was made on her there on the following Monday. While her testimony is disputed and there is some inconsistency between her evidence and that of her supporting witnesses, we are of opinion that he was there that evening, but it is not necessary to make a definite finding in the matter.

The master accused her of disingenuousness in her testimony as to her home. She insisted that while she was living in Baltimore with her two brothers, her *home* was with her husband; that she had never given it up. It was, plainly, a conclusion of law rather than a statement of fact, which she was making. She was not obliged, in any event, to *sell* her house in Baltimore, as the master suggested, nor could she be criticized for not leaving it until her husband provided her a home and asked her to come to it.

We are satisfied that the libellant has not established his cause of action. On the contrary the respondent has effectually disproved it.

The decree is reversed and the libel is dismissed at the costs of the appellee.