STUMPF, JR. *v.* STUMPF

[No. 244, September Term, 1961.]

(Six Appeals In One Record)

*Decided April 19, 1962.*

*Motion for rehearing filed May 15, 1962, denied May 17, 1962.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT, HORNEY and SYBERT, JJ.

*Hilary W. Costello,* for appellant.

*Philander B. Briscoe,* with whom was *William Morris Kemp* on the brief, for appellee.

HAMMOND, J., delivered the opinion of the Court.

This Court in *Wood v. Wood,* 227 Md. 211, 216, recently repeated what prior cases had said from time to time in regard to a separation of spouses—"acquiescence to or assent to what one cannot prevent does not amount to a voluntary agreement thereto." See, for example, *Rhoderick v. Rhoderick,* 224 Md. 478, 481; *Moran v. Moran,* 219 Md. 399, 404; *Courtney v. Courtney,* 213 Md. 600, 602; *Miller v. Miller,* 178 Md. 12, 21. On the other hand where the husband demanded in anger that the wife leave and she did not refuse, but agreed and did leave, it was held in *Matysek v. Matysek,* 212 Md. 44, that the language and conduct of the couple were enough to support the chancellor's explicit finding that the separation was voluntary.

The principal problem in the appeal before us is to determine on which side of the line the case falls, for, although the chancellor found that neither party was guilty of desertion and that the separation was not voluntary, it is clear to us that either the wife deserted the husband or their separation was voluntary despite the wife's claim that she was deserted.

The record reveals a marriage of almost twenty-five years' duration. The husband and wife impressed the chancellor as being "very fine people of excellent character." The husband was somewhat unstable, having been hospitalized during periods of depression in 1954 and 1959. He was employed by the same company during almost all of the period of the marriage but apparently was not a good manager, spending more on alcoholic beverages, long vacations, and a summer home on the Eastern Shore than he should have. During his hospitalization in 1954, the wife worked as a saleswoman and managed to pay off back bills, keep up-to-date the payments on their house, and put their finances on a sound basis. From 1954 until the break in 1959, the husband's paychecks were sent at his direction to his wife, who handled the family finances.

In 1959 he was admitted to the University Hospital for psychiatric care. The wife says, and he denies, that his condition was brought on by excessive addiction to alcohol. His wife visited him daily in the hospital until the last four or five days. About this time, before his discharge, he went home to get some money to purchase a few personal articles. His wife did not want him to have the money, and there was an argument, during which he said he would take over handling the finances and receive his paychecks himself. It seems evident that from this moment on, the wife was determined not to continue the marraige unless the husband again permitted her to be the financial "boss" of the family. She did not thereafter visit her husband at the hospital. On the day of his discharge, August 24, 1959, he says he telephoned his wife to come for him, waited four hours for her, and then was visited by two of their sons, who brought him $25.00 and told him, "Mother doesn't want you to come home—go somewhere else." The sons say that when they arrived, their father was in a telephone booth and they heard him say, "I am not wanted at home," and that they gave him $25.00 but no message. There can be little, if any doubt, that he was told by his wife, in one way or another, that he was not to come home and that the money was sent to provide a lodging for him elsewhere. The boys took him to a hotel where he spent the night. He tele-

phoned his wife, who accused him of leaving the hospital against orders and then hung up on him.

The next day he called upon a priest whom his wife had consulted, and as a result of his conversation with the priest decided not to try to return home. He went to the Eastern Shore and lived for several months in a small cottage he rented for $40.00 a month. (He says, to recuperate; she says, to loaf as he like—and as he was accustomed to do from time to time.)

On September 17, 1959, he wrote his wife that he had not left her or their home but was merely acceding to her wish that he not come home. On October 2, 1959, he wrote again, expressing the hope that their twenty-fifth wedding anniversary, on November 15, would not pass with things as they were. The wife did not answer the letters—she says she did not know her husband's address, but gave them to the priest. About a week after the writing of the second letter, the husband talked with the priest, who then had the two letters, and he was advised not to further attempt reconciliation because his wife did not want it.

Twice the husband was asked in his wife's presence why he did not go home. Each time he replied that it was because his wife did not want him, and each time she made no comment or answer. He testified that his wife would not accept him as a husband and said, "I didn't need a room, I wanted a wife."

The wife testified that her faithfulness over the years, her working to pay the bills, and her tolerance of her husband's deficiencies and traits showed she wanted him back if he "behaved himself." Her testimony reveals, perhaps not unnaturally, almost an obsession with finances. She said: "As soon as he has money he has to do exactly as he pleases with it, and everyone suffers. Five years ago when he went to Seton's, and right now, the foolish expenditures. * * * And with him going back and forth to the Eastern Shore—I am so tired of it when he has responsibilities at home. * * * My only complaint in the court, your Honor, is finances."

On March 28, 1961, just a little more than eighteen months from the day the husband left the hospital, the wife filed suit for divorce *a vinculo* and alimony, on the ground of desertion.

The husband filed a cross-bill alleging that he had been deserted. On June 1 the wife filed an amended bill praying alimony only. The husband added a supplemental cross-bill to the docket, in which he sought an absolute divorce for desertion and, alternatively, for voluntary separation.

The chancellor, after hearings in open court, found that when the husband left the hospital the wife did not want or expect him to return to their home but that she later was willing to accept him back provided "he conducted himself as a good husband and made adequate provision for the support of his family." He added that "this Court is of the opinion that a simple telephone call from Mrs. Stumpf to her husband asking him to come back would have effected a reconciliation." He found further that Mr. Stumpf was not "blameless in this unfortunate affair" because he gave no indication that he wanted to come back, spent considerable time on the Eastern Shore and failed to furnish adequate financial support after the separation. He concluded that neither party was guilty of desertion and that there was no evidence of voluntary separation, and dismissed both bills but ordered alimony of $30.00 a week to the wife and the payment by the husband of the monthly mortgage installments on the home. Both sides appealed.

Thereafter, an amended decree was filed in which no provisions for alimony or mortgage payments appeared. Both sides again appealed. After each decree the wife filed a petition for costs and counsel fee, and a motion of *ne recipiatur* to the husband's answers to these petitions. Each motion of *ne recipiatur* was denied, although costs and counsel fee were ordered to be paid, and the wife appealed from each denial. She also appealed from an order awarding her alimony pendente lite, complaining of the amount awarded.

Preliminarily, we find that there was no prejudicial error in the award of alimony pendente lite in the amount complained of. The husband was out of work, almost out of funds and unable to obtain work when he was told to pay $10.00 a week.

The wife's contentions as to the denials of her motions of *ne recipiatur,* assuming them to be properly appealable as

separate issues, are disposed of by our conclusions on the main issue.

We think Judge Byrnes was right in finding that the wife did not intend to let her husband come home from the hospital, and we find the evidence to show that she intended to end the marital relation for as long a time as it took to persuade the husband to agree to her terms for its resumption, that is, until he again turned the finances completely over to her. This intention on her part to separate constituted desertion unless there was voluntary agreement by the husband that he too wanted the separation and the cessation of the marital relation. We also think that Judge Byrnes was correct in his conclusion that there was no evidence that the husband agreed to separate and that the case is, in this respect, more like *Rhoderick v. Rhoderick, Courtney v. Courtney,* and *Miller v. Miller,* cited previously, than it is like *Matysek v. Matysek,* also referred to earlier.

The husband was the rejected one and, as such, not compelled to seek a reconciliation, although he did make efforts to patch up the marriage before he was finally convinced that reconciliation was possible only on the legally untenable terms established by his wife. *Cf. Grubb v. Grubb,* 200 Md. 452. Thereafter he did no more, as we see it, than acquiesce in what he was not required to prevent by accepting a status the law does not require him to accept. *Cf. Courtney v. Courtney, supra.* The wife, who broke up the marriage, made no real effort at reconciliation, but was unyielding in her first determination to be the financial "boss" or not be a wife, and in so doing she deserted her husband.

Therefore, Judge Byrnes' conclusions that the wife was not guilty of desertion and that the husband, although likewise not so guilty, was blameworthy and not entitled to a divorce, were erroneous.

The wife complains of the admission in evidence of copies of the two letters written to her by her husband and of a newspaper clipping from the *Cambridge Banner.* As we have noted, the wife had given the letters to her priest-adviser, and, although requested to do so, she did not produce them in court,

356

nor explain why she did not. The husband's copy was a handwritten first draft of the handwritten letter he sent his wife, which he stated was an "edited" final draft. The wife's counsel did not pursue the subject on cross-examination and never asked the husband to explain what he meant by "edited." Under the circumstances there was no error in admitting the husband's "copy" of the first letter. See *McCormick, Evidence,* Secs. 202, 203, 205. There was no objection to the admission of the second letter. Finally, regarding the newspaper clipping— which stated that the husband was visiting the Cambridge area and would shortly be joined by his wife, the chancellor seems not to have deemed it of any significance; if its admission was erroneous, it certainly was not prejudicial.

> *Decree reversed, and decree entered divorcing the husband a vinculo matrimonii from the wife, costs of this appeal to be paid by the husband.*