## LEVY *v.* LEVY

[No. 317, September Term, 1961.]

104

*Decided June 14, 1962.*

The cause was argued before BRUNE, C. J., and HAMMOND, PRESCOTT, HORNEY and SYBERT, JJ.

*Edward Pierson,* with whom were *Pierson & Pierson* on the brief, for appellant.

*Eugene A. Alexander, III,* for appellee.

SYBERT, J., delivered the opinion of the Court.

This appeal is from a decree awarding permanent alimony, without divorce, to a wife, as well as custody of, and support for, the infant child of the parties, and a counsel fee for her solicitor, on the ground that the husband had deserted her without just cause. The husband challenges only that portion of the decree granting permanent alimony, contending that the Chancellor erred: (1) in finding that he had in fact deserted his wife; (2) in finding that he had not made proper and sufficient efforts to effect a reconciliation; and (3) in failing to give weight to evidence that appellee was unwilling to be reconciled and had in fact taken steps to insure a permanent separation of the parties. It is, of course, well settled that permanent alimony may not be awarded unless the complainant shows grounds sufficient to support a decree of either form of divorce. *Russell v. Russell,* 224 Md. 329, 167 A. 2d 770 (1961).

The parties were married in February, 1960, when he was thirty-one years of age and she twenty-two. The husband was

a graduate doctor of medicine and after the marriage completed his residency in neurology at a Baltimore hospital and remained there for further work in that field. Through a medical grant and other sources, he received an adequate income. The wife, who was a school teacher, continued to work for some months after the marriage. A daughter was born in December, 1960.

The voluminous testimony reveals that from its inception this union was marred by numerous quarrels due to headstrong behavior and an apparent lack of understanding by both parties of the fact that patience, forbearance and consideration for the other's point of view are vitally necessary in order to effect the reasonable adjustments required to achieve success for any marriage. The incidents prior to the ultimate break-up, while exacerbating the feelings of the parties, are not worthy of mention as legal grounds for termination of the relationship. A comment made by the husband on the witness stand is singularly revelatory of their triviality: "We had quarrels all that week [just before the separation] * * * and I don't remember all the things we quarreled about. * * * I think probably some of them are not as important as I thought then * * *."

One major source of friction appeared to be the respective parents of the parties. A visit by them, or even discussion of such a visit, usually resulted in electrifying the atmosphere. The birth of the child seemed only to provide another cause of strife. It was disagreement over the care of the infant which triggered an argument leading to the husband's leaving the matrimonial domicile on May 5, 1961, saying, according to the wife, "I am leaving. I have had enough." She testified that she asked him not to leave and that upon his return three or four hours later she threw her arms around him, but that he then said, "Now, look, I haven't changed my mind. I am still leaving you. I just came home to spend the night here and I am going to see my lawyer in the morning to find out what my rights are." He deposited $500 in the joint checking account of the parties on that day, but packed his bags and left the next day. The wife said she ran to the door and said, "Donald,

please, can't we talk? Please." He testified that he was very angry and felt his leaving was justified, but that he did not intend to remain away permanently. He stated he hoped to shock his wife into a realization that they "couldn't go on this way, that things were too upsetting," and he also hoped to persuade her to go to a marriage counselor with him. This, also, had been a source of difference, since (as was the case with most other matters) the parties had never been able to agree upon a counselor.

The husband returned to the apartment at various times to take away more of his belongings and to visit the child. He continued to pay the apartment rent and gave his wife $25 a week as support money. A week after leaving he withdrew the balance of the money in the checking and savings accounts held jointly with his wife. The reason given by him was his anger over an incident that had taken place on one of his visits. His wife, upon returning home from the beauty parlor, had found the car of her mother, who had been baby sitting, gone and her husband's car in front of the apartment, and, becoming fearful of his "uncontrollable temper", as she explained, had called the police, who suggested to the husband that it would be better if he left quietly. The husband later informed the gas company, telephone company and various commercial establishments by letter that he was separated from his wife and would no longer be responsible for her bills, and he sent copies of the letters to his wife, whom he addressed as "Madam". This was done, the husband testified, because of the purchase of a quantity of furniture by his wife and the pressure of his own financial responsibilities. The wife stated, however, that she had given him all the money she earned after the marriage for the purchase of furniture.

The wife continued to live in the apartment until July, 1961, when she moved into the home of her parents. The husband had never returned to stay in the apartment though he continued to pay the rent and the $25 support money to his wife, designating it as "child support" after she began living with her parents. His contacts with his wife after she had left the apartment continued to be in the form of visits to the child.

The physical leaving by the husband after one of many domestic arguments and his refusal to return, his closing of jointly held bank accounts, and his letters to the utility companies and commercial establishments that he would not be responsible for his wife's debts, constituted sufficient acts on his part to lead us to conclude that the Chancellor was not clearly erroneous, if erroneous at all, in holding that the husband had deserted the wife, without sufficient cause. Maryland Rule 886 a; cf. *Provenza v. Provenza,* 226 Md. 63, 172 A. 2d 503 (1961); *Hooper v. Hooper,* 224 Md. 65, 166 A. 2d 734 (1961).

The Chancellor also found that the husband's efforts to effect a reconciliation were unconvincing as to their genuineness, that the wife's actions were justified, and that hence she was not guilty of constructive desertion. Again we can see no basis for holding that the Chancellor was clearly in error. There were many opportunities for the husband on his visits to the child to make known to his wife his sincere desire—if it existed—to renew cohabitation. The husband claimed that his wife refused to talk with him on his visits whereas the wife stated, "I always asked Donald to come back to me." The trial court obviously believed the wife. The fact that the wife's father also testified as to the husband's unreasonable behavior on his visits may have been an influencing factor, particularly since the father had attempted to effect a reconciliation soon after the separation. This Court has held in effect that where testimony in a divorce case is so conflicting that it is impossible to determine from the record with any certainty who told the truth, the Chancellor's findings should be given great weight and not be lightly disturbed on appeal. *Miller v. Miller,* 204 Md. 509, 104 A. 2d 921 (1954); *Buttion v. Buttion,* 189 Md. 305, 55 A. 2d 839 (1947). The Chancellor was also impressed with the fact that the husband had never attempted to withdraw his refusal to pay the gas and electric bills or to provide an apartment for his wife after she moved into her parents' home. The husband stresses the fact that at the first of two meetings between the attorneys for the parties, at which the husband but not the wife was present, the husband had answered "Yes" to a query by

the wife's attorney as to whether he was interested in reconciliation. The meeting itself had been arranged to discuss visitation and support and the question by the wife's attorney appeared to be an off-hand remark at the close of the meeting, with little discussion of the matter. There was no evidence that the wife ever learned of the remark made by the husband. She testified that she first heard of it at the trial. The inconsequential effect to be given to communications made through counsel or other intermediaries is thoroughly discussed in *Hokemeyer v. Hokemeyer,* 194 Md. 223, 71 A. 2d 15 (1950), and *Hornstein v. Hornstein,* 195 Md. 627, 75 A. 2d 103 (1950). A second meeting was held at counsel's office at which the husband and wife and her father had occasion to talk privately. The wife testified that reconciliation was not discussed and that the main topic was the amount of support to be paid, although she also stated that the husband renewed certain demands in regard to his parents and that "when we lived together everything has to be the way he wants it." The husband's version varied considerably, and he testified that a sincere offer of reconciliation was made by him. As we have stated, because of the directly conflicting testimony this is peculiarly a case where due weight should be given to the Chancellor's findings in view of his opportunity to see and hear the witnesses, and under the circumstances we cannot say that he was clearly erroneous in concluding that no bona fide offer of reconciliation was made.

As to the final contention raised, since it was the husband who left and made the final break, it was incumbent on him to support his claim of constructive desertion by the wife. *Provenza v. Provenza, supra.* The steps which he alleges she took to make certain the separation would be permanent are not convincing. She testified she had changed the lock on the apartment for her protection when she learned from a maintenance man that several persons had keys to all the apartments. Her leaving the apartment for her parents' home two months after the separation did not make reconciliation by the husband impossible. It is significant that after these events, as well as after the occasion spoken of earlier when the wife called the police to her apartment, the husband continued to

make visits to see the child at the home of the wife's parents, where she was then living, without any difficulty.

A great deal of weight is sought to be given to the wife's alleged refusal, in her testimony in court, to consider reconciliation with her husband. Examination of her testimony plainly reveals that her remarks about not wanting to be reconciled referred to the time of trial and not the period before suit was filed. In any event, "* * * offers and refusals from the witness stand deserve a minimum of weight. In such testimony too often the theatrical element is at a maximum, sincerity at a minimum." *Hornstein v. Hornstein, supra.*

We find nothing in the record which would support a holding by us that the findings of the Chancellor were clearly erroneous. Since the wife established desertion on the part of the husband, the decree for permanent alimony was proper.

*Decree affirmed, with costs.*