# SULLIVAN *v.* SULLIVAN

[No. 229, September Term, 1963.]

68

*Decided March 9, 1964.*

The cause was argued before BRUNE, C. J., and HAMMOND, PRESCOTT, MARBURY and SYBERT, JJ.

*Thomas J. Wohlgemuth,* with whom were *Smith & Wohlgemuth* and *Michael Demyan* on the brief, for the appellant.

*Richard S. Clark,* with whom was *Howard L. Muhl, Jr.,* on the brief, for the appellee.

PRESCOTT, J., delivered the opinion of the Court.

The Chancellor granted a husband an absolute divorce on the ground of a voluntary separation of the parties for eighteen months; he denied the wife's request for a divorce *a mensa et thoro* (based upon an alleged desertion) ; he awarded custody of the parties' six minor children to the wife; and he ordered the husband to pay the wife sixty dollars per week for the children's support. The wife, alone, has appealed.

The questions posed by the parties are: (1) was there sufficient evidence to justify a decree divorcing the parties on the ground of their having voluntarily lived separate and apart for the statutory period; and (2) was there sufficient evidence to require a decree in favor of the wife for a divorce *a mensa et thoro*?

The record reaches us in a rather unsatisfactory condition. The evidence is scanty and conflicting; and the Chancellor filed no opinion making any findings of fact. It would seem to have been most desirable for counsel, who intended to appeal, to have invoked Maryland Rule 18 (c), so that the parties and this Court would have had the benefit "of the grounds for [the Chancellor's] decision." Compare *Levy v. Levy,* 229 Md. 103, 181 A. 2d 663. It is obvious, however, from his decree that the Chancellor found that the parties had "voluntarily lived separate and apart, without any cohabitation, for eighteen consecutive months prior to the filing of the bill of complaint, and such separation [was] beyond any reasonable expectation of a reconciliation," Code (1963 Cum. Supp.), Article 16, Section 24, and that his finding was not based upon the husband's testimony alone, but the same had been corroborated. Code (1957), Article 35, Section 4; Maryland Rule S75. The above findings necessarily included a finding that the husband, who, as we shall soon see, actually left the parties' place of abode, did not desert the wife. We proceed to an examination of the testimony to see if the findings were justified.

The parties were married in March of 1946 in Connecticut, but had lived in Maryland for eleven years before the institution of these proceedings. The husband is a traveling washing machine repairman. Six children, ranging now in age from six

to fourteen years, were born as a result of the marriage. During the summer of 1961, the children spent their vacation in Connecticut with the wife's family. The wife testified that her husband told her that he intended to leave the home, and would leave, before the children returned to begin school in the fall, and the husband did not deny that he had made the statement.

The children returned without his having left, but after supper on August 16, 1961, matters came to a head. The husband testified that he did not want to leave the home, but: "the final thing I blew my stack on was I come in and I couldn't get in the bathroom because of dirty clothes and the floors and the bath tub full. Just the house in a mess. The dishes were in a pile stacked up in the sink." And this had been going on, over his protestations, for a long period of time. He told his wife that he "had taken all [he] could take," and she said, "Well, then you leave, I think it is the best thing to do * * *. I will pack your clothes." (This statement attributed to the wife was flatly denied by her.) He then went out and found a place to live, and when he returned with two friends and a truck, she had most of his clothing packed. He and his friends placed his clothes and a few articles of personal property in the truck and he left. He left "because [he] couldn't stand it anymore." Since leaving, he claims that he has never had sexual relations with his wife. He admitted his wife had requested him to return, but couldn't "swear" whether it was around Christmas of 1961 or not. He did not think he had ever "spent the night" at his former home after leaving, but the "night of Christmas [presumably of 1961] was questionable."

Two days after he left, he came back and asked his wife to sign (at the insistence of his bank) a note with him, so that he could procure furniture for his new apartment, and this she did.

The only witness offered by the husband was one of the friends who helped him move. He stated that the husband told him he was going to leave and asked the witness to help him move. When he got to the house, the oldest girl, Jackie, was coming down from upstairs carrying a suitcase, and the wife was coming out of the bedroom with some clothes. When asked if the wife helped "to move the stuff out," he replied that she

was "bringing it" out to the living room and he and the husband carried "it" to the truck. The wife did not "appear" to be mad, but she "did appear" to be cooperative.

The wife testified that her husband had threatened to leave her for years, and he finally told her that "he was leaving and that there was nothing [she] could do." He had told her, as we stated above, he was going to leave before the children returned from Connecticut, but he did not do so. She had to go alone to bring them back, and, after they were back a week or so, the husband brought in "two men one night unannounced," took what he wanted, and left in a truck. She knew that he was planning to leave, but not on the particular night that he did; consequently, the clothing that he was going to take was not packed and ready for him, as he had testified. She emphatically denied that she wanted him to leave or ever told him to do so, but on the contrary, she "would have done anything to keep him home for the sake of the children."

She stated that she helped her husband pack his clothes, and gave her reasons for doing so. She realized she "couldn't take this husband of mine and hog-tie him down to a chair and physically force him to stay." The six children were "under a severe emotional shock," and were "crying and upset." Her husband was packing ("just throwing") clothes into bags, so she suggested that he use a suitcase. He said that he did not have one, so the oldest girl went upstairs and got the children's suitcases, and she and the daughter "to help we just helped him pack," but his leaving "was not on a voluntary basis * * * so far as [she] was concerned."

After his departure, she had on many occasions requested him to return, and the children had done likewise. On the night of Christmas, 1961, her husband spent the night at her home and slept with her. On this occasion and innumerable others, she had had sexual relations with him, the last such occasion being in November of 1962.

She further testified that she did not believe there was any hope of a reconciliation, because "an awful lot of water has gone over the dam," she has had "to make a new adjustment to [her] life," she has had to go to work, and has had "quite a lot of psychological problems with the children," one daughter

has "turned epileptic," and her husband doesn't take any interest, so she "just know[s] that it is hopeless."

Her version of why she signed the note so that her husband could procure furniture was that "he couldn't make up his mind whether I would end up with the [family] car." The bank would not make her husband a loan unless she also signed the note. She told him she would sign his note, if he would assign the title to the car to her. He agreed and she signed the note. He finally assigned the title to her after demanding, and receiving, an additional one hundred dollars from her.

Since the issues between the parties, as we set them out above, are clearly defined, it will be unnecessary to state her testimony relative to the children's clothing and alleged dirty dishes; nor will it be necessary to state what is reasonably to be expected with six young children and two parents living in what was apparently a comparatively small residence with one bathroom.

The wife originally instituted suit on October 2, 1961, for a limited divorce on the ground of desertion. The husband answered and filed a cross-bill alleging constructive desertion. Thereafter on April 26, 1963, the husband filed a supplemental bill praying an absolute divorce on the ground of voluntary separation, and the wife answered the same. No question is raised concerning the pleadings or the legal effect, if any, of the allegations in the husband's original cross-bill; hence, we express no opinion relative thereto.

As used in our statute, and as construed by many decisions of this Court, a voluntary separation as a ground for divorce connotes and requires a mutual agreement between the husband and wife to live separate and apart with a common intent not to resume marital relations. *Matysek v. Matysek,* 212 Md. 44, 128 A. 2d 627, and the many cases therein cited at page 47.

The appellee in the case at bar attempts to bring himself within the ambit of *Matysek,* because he testified that, after he told his wife he had taken all he could, she stated, "Well, then you leave, I think it is the best thing to do," and in *Matysek* the husband told the wife to "Get out," and she said, "All right," and did so. However, in that case the conversation constituting the agreement was specifically corroborated by a wit-

ness and not disputed by the husband. In the case at bar, no witness confirmed the alleged conversation between the husband and wife, and the wife flatly denied the part thereof attributed to her.

But, argues the appellee, his version of the conversation is corroborated and confirmed by his wife's helping him to pack his clothes and her signing of the note. We think the wife's explanation of both of these incidents was reasonable, and her conduct was not such as to manifest a voluntary agreement upon her part to live separate and apart. This Court held in *Lloyd v. Lloyd,* 204 Md. 352, 104 A. 2d 595, that a separation, which was not established to be voluntary at its inception, did not, under the circumstances of that case, become voluntary because the wife took some household furnishings to her parents' home where she had gone to live, agreed to the sale of the spouses' former home and accepted part of the proceeds of the sale, and her attorney indicated that she would agree to a divorce if the husband would give her $4,000, and the wife stated to the husband, "so far as I'm concerned we are through." It seems to us that the evidence in the case at bar, relative to the conduct of the wife, does no more than to bring it within the scope of what Judge Hammond, for the Court, said in *Stumpf v. Stumpf,* 228 Md. 350, 351, 179 A. 2d 893: "This Court * * * recently repeated what prior cases had said from time to time in regard to a separation of spouses—'acquiescence to or assent to what one cannot prevent does not amount to a voluntary agreement thereto.' " And a realization by both spouses that their separation is final does not, *ipso facto,* establish an agreement that they will live separate and apart. *Beck v. Beck,* 180 Md. 321, 24 A. 2d 295; *Lloyd v. Lloyd, supra.* We, therefore, hold that the Chancellor was in error in granting the appellee a divorce *a vinculo matrimonii.*

II

This brings us to a consideration of whether the wife should have been granted a limited divorce. We have held above that the evidence failed to establish a voluntary separation of the parties. Yet, evidence which is uncontroverted shows that the husband left the marital residence on August 16, 1961, and has

never returned to reestablish the full conjugal relationship. He does not rely on any conduct of the wife to justify his leaving, other than the alleged voluntary separation. (We pointed out above that he complained of children's clothing in the bathroom and dirty dishes, but these factors were not relied upon to warrant his leaving. Compare *Stecher v. Stecher,* 226 Md. 155, 172 A. 2d 515.) And he admits there is no reasonable expectation of a reconciliation, although this is not an essential factor in a divorce *a mensa. Thurlow v. Thurlow,* 212 Md. 222, 129 A. 2d 170. In addition, he conceded that the wife had requested him to return, and he raises no question as to the sincerity and good motives of the request. The evidence, we think, clearly establishes the husband left the home and he intended not to resume the connubial relationship. Ordinarily under these circumstances, a wife is entitled to a divorce on the ground of abandonment.

However, the wife's original bill was filed on October 2, 1961, alleging she was deserted in August of 1961. She testified that she continued to have sexual relations with her husband thereafter on any number of occasions down until November 1962, some thirteen or fourteen months after instituting these proceedings. She stated that, "he would call me up at any hour of the night," and sometimes would ask if the children were in bed so he could come down and see her for the purpose of sexual relations. It will be noted that this is not the case of a wife alleging cruelty of treatment, claiming fear, coercion or duress, compare *Sullivan v. Sullivan,* 223 Md. 74, 162 A. 2d 453, but a wife, who asserts desertion in August of 1961 as her cause of action, and not only admits, but insists, that she freely and voluntarily copulated with her husband on many occasions until November of 1962.

There can be little doubt that under the above circumstances the wife condoned and terminated any desertion by the husband existing before her last act of sexual relations with her husband in 1962. Such relations are legally compatible only with marriage, not with separation. As was stated by Judge Markell, for the Court, in *Smith v. Smith,* 198 Md. 630, 634, 84 A. 2d 890: "the marital relations in August * * * amounted in law to a termination of any existing desertion * * *. * * *.

To constitute condonation, other conduct [than sexual relations] may require evidence of intent, but we think the sound view is that the law itself ascribes to marital relations the conclusive effect of condonation [explained in *Sullivan v. Sullivan, supra*] and specifically of terminating desertion. * * *. The concept of 'constructive desertion', when the deserter and the deserted continue to live under the same roof, cannot make out of marriage a hybrid status of separation with occasional concubinage." The latter, stated in slightly different language, is that the law does not permit separated spouses to litigate by day and copulate by night. The cases and text writers are legion in support of the above. To cite but a few, see *McGovern v. McGovern,* 160 A. 822 (N. J.) ; 27A C.J.S. *Divorce,* § 61 d.; *Collins v. Collins,* 193 So. 702 (La.) ; *Trussell v. Trussell,* 177 A. 215 (Pa. Super.) ; *Rushmore v. Rushmore,* 168 A. 614 (N. J.) ; *Shirey v. Shirey,* 112 S. W. 369 (Ark.) ; *Davidson v. Davidson,* 10 A. 2d 197 (Vt.) ; *Wright v. Wright,* 43 N. W. 2d 424 (Nebr.) ; *Phinizy v. Phinizy,* 114 S. E. 185 (Ga.) ; *DeBerry v. DeBerry,* 177 S. E. 440 (W. Va.) ; 1 Nelson, *Divorce and Annulment* (2nd ed.) §§ 11.03, 11.10. Compare *Kline v. Kline,* 179 Md. 10, 16 A. 2d 924. We hold that the wife condoned any existing desertion by the husband prior to November of 1962.

This brings us to a situation where, at the trial below, a wife had filed a bill for divorce on the ground of desertion occurring in August of 1961 and she had condoned any such desertion prior to November, 1962, but, possibly, there was a desertion of her by the husband after that date but before the case was heard on May 1, 1963. Clearly, the Chancellor could not have granted her a divorce for the cause alleged in her original bill, nor was he, under the pleadings, entitled to consider any new ground for a divorce occurring after the filing of her bill. *Kirkwood v. Kirkwood,* 165 Md. 547, 170 A. 180; *Besche v. Besche,* 209 Md. 442, 121 A. 2d 708; *Smith v. Smith,* 216 Md. 141, 140 A. 2d 58; *Jones v. Jones,* 117 P. 414 (Ore.) ; *Collins v. Collins, supra; Orens v. Orens,* 102 A. 436 (N. J.) ; *Lee v. Lee,* 51 Ill. App. 565. Formerly in Maryland, where a new cause of action for divorce by a plaintiff arose after the institution of divorce proceedings, it was necessary to institute

a new suit based upon the new ground, even though such ground arose before the trial of the first suit. *Smith v. Smith, supra.* However, since that case was decided, this Court has adopted Maryland Rule S72 c., which provides: "A supplemental bill alleging grounds for divorce subsequent to the filing of the original bill shall be permitted." Compare Maryland Rule 379. We think that the wife should be afforded an opportunity, if she so desires, to file a supplemental bill and establish, if she can, a desertion of her by the husband after November, 1962.

The case of *Tarr v. Tarr,* 164 Md. 206, 164 A. 543, is readily distinguishable from the one at bar. In that case the husband filed suit for an absolute divorce on November 13, 1931, alleging three years' prior desertion. The wife filed a cross-bill, on February 6, 1932, for a limited divorce on the ground of desertion. She testified sexual relations ceased on November 29, 1931, more than two months before the filing of her cross-bill. The Court rejected the husband's claim and granted the wife a limited divorce, which, in Maryland, may be granted without regard to the duration of the abandonment.

The decision of this Court will not, of course, affect the provisions of the decree relating to the custody of the children, the payments for their support or the payment of the solicitor's fee.

> *That part of the decree granting the husband a divorce is reversed. That part of the decree which refused the wife a limited divorce is neither affirmed nor reversed, but is remanded for further proceedings not inconsistent with this decree. The husband to pay the costs.*