## STATE OF MARYLAND *v.* PANAGOULIS

[No. 288, September Term, 1968.]

*Decided May 30, 1969.*

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, McWILLIAMS, SINGLEY and SMITH, JJ.

*John J. Garrity, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General; Donald Needle, Assistant Attorney General; Arthur A. Marshall, Jr., State's Attorney for Prince George's County;* and *Vincent J. Femia, Assistant State's Attorney for Prince George's County* on the brief, for appellant.

*Jerrold V. Powers,* with whom were *Martin H. Freeman* and *Sasscer, Clagett, Powers & Channing* on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court.

On February 6, 1967, the Prince George's County grand jury returned indictments for bribery on two counts against George J. Panagoulis, the County's superintendent of police. Panagoulis moved to dismiss the indictments on the ground that, having testified before the grand jury on November 4, 1966 without formally waiving his privilege against self-incrimination, he had acquired an immunity from prosecution under Maryland Code (1957, 1967 Repl. Vol.) Art. 27, §§ 23 and 39. From the order of the circuit court dismissing the indictments, the State appealed to the Court of Special Appeals, which affirmed. *State v. Panagoulis,* 3 Md. App. 330, 239 A. 2d 145 (1968). We granted certiorari.

Evidence was adduced at the hearing on the motion to dismiss to show that a "congressional candidate" had presented information to the grand jury of Prince George's County concerning alleged irregularities in zoning matters and that Panagoulis was among those persons alleged to be "involved". A newspaper article admitted in evidence quoted the state's attorney as saying that "every name" given by the informant would be questioned by the grand jury. Panagoulis testified that he was aware of this. He said that on November 3, 1966, Vincent J. Femia, then an assistant state's attorney for Prince George's County, called him about making a statement to the state police investigators. About 11:30 P.M. that evening, Femia again called Panagoulis, who, as a result of the call, went to the Seat Pleasant police station. He arrived there around midnight and found Femia and two state police corporals present and was interrogated by them "on matters pertaining to these zoning irregularities" for about two and one-half hours. At the conclusion of the interrogation, Panagoulis asked Femia "if it would be necessary for me to appear before the Grand Jury since I had already given this testimony to the police officers, and he answered yes * * * I then asked him when and he said, 'this morning.' "

Femia's account of the conversation was somewhat different:

"I believe the Chief's [Panagoulis'] words were, 'Would it help if I appeared before the Grand Jury?'

Then he changed it before I had a chance to say anything. He said, 'Would it help the Grand Jury if I appeared before the Grand Jury?'

"I said, 'Well, to tell the truth, George, from what I have heard tonight [referring to Panagoulis' statement taken by Femia] it sure can't hurt you and it has to help them, any information they can get'".

Later in his testimony, in response to a question, "At any time, Mr. Femia, did you tell Major Panagoulis it was necessary for him to appear before the Grand Jury?" Femia said, "Absolutely not", and added, "But I do know this, that at no time did I indicate that he had to testify. At no time did I indicate this to him. Now, I have been a prosecutor long enough to know that if a man stands accused of anything the last place you take him is in the Grand Jury room. This sort of puts you out of business."

Each of the state police officers present during the interrogation of Panagoulis had some recollection of the conversation between Femia and Panagoulis about the grand jury. Neither could recall the exact words. One testified that Panagoulis "said something to the effect that he wanted to appear and get this whole mess straightened out." The other stated he heard Panagoulis saying that "he was anxious to clear this matter up, that he wanted to do anything possible to clear the matter up, and that he was—wanted to know if he could help the Grand Jury in any way by testifying, and that he was anxious to testify before the Grand Jury if that would help in any way clear it up."

Arthur A. Marshall, Jr., the state's attorney for Prince George's County, testified that during the investigation Panagoulis offered "to turn over all of his books and records, I think he did, and income tax statements. I believe he has done that. He offered to meet with these state police investigators, and I do know offered to do anything that was possible to bring this to a conclusion." He also testified that, between October 25, 1966 and November 4, 1966, during a telephone conversation with Panagoulis, Panagoulis asked "* * * if there was anything he could do, and he offered to come before the Grand Jury or do anything further that he could possibly do to cooperate. I think

his words would have been something to the effect like, 'Would it help to come before the Grand Jury, would it satisfy them,' and I think my response would have been something like, 'It certainly wouldn't hurt you.'" Marshall said he never directed Panagoulis to appear before the grand jury, did not issue a summons for him to appear and did not, either by letter or orally, direct his appearance.

Panagoulis called Femia about 9:15 A.M. on November 4, and Femia asked him to "come down." He met Femia at the police office and they went to the grand jury room by way of the "back door" to avoid publicity.[1] Panagoulis testified before the grand jury on the zoning matters. A transcript of a part of the proceedings before the grand jury was read into evidence:

"The Grand Jury was convened, pursuant to recess, at 10:59 o'clock a.m., all twenty-three members being present, at which time the witness George J. Panagoulis entered the room.

"The Foreman: Do you have any objection to taking an oath recognizing a superior being?

"Major Panagoulis: I most certainly do not, sir.

"The Foreman: Would you raise your right hand?

"Major Panagoulis: I certainly will.

"The Foreman: In the presence of Almighty God do you solemnly promise and declare the evidence you shall give the grand inquest of the State of Maryland for the body of Prince George's County shall be the truth, the whole truth and nothing but the truth?

"Major Panagoulis: I do.

"The Foreman: Have a seat, please.

"Mr. Femia: Ladies and gentlemen, may I start off by saying that the Chief, myself and the staff investigators have been up until three o'clock, 3:30, whatever it was, this morning recording all of what you are about to hear in great detail.

---

1. According to the clerk charged with the ministerial duty of scheduling and arranging for the appearance of witnesses before the grand jury, Panagoulis' name was not on her list of witnesses for November 4, 1966, and she did not know that he was to appear that day.

"Whereupon

George J. Panagoulis

was called as a witness, and having been first duly sworn, was examined and testified as follows:

"The Witness: May I, Mr. Foreman, make an opening statement?

"By Mr. Femia:

"Q Chief, I am going to ask you first, for the record, please, your name and occupation.

"A George J. Panagoulis, Superintendent of Police, Prince George's County.

"Q Chief, you are apparently well aware of why we are here today?

"A That is correct, sir.

"Q Chief, would you like to lay some groundwork with some sort of opening statement?

"A Yes. May I say that at the outset I wish to express my sincere appreciation to the staff of the State's Attorney's office"—excuse me—"the staff of the State's Attorney, Mr. Marshall, Mr. Femia, and to the members and foreman of the Grand Jury for affording me this opportunity to appear before you this morning to clarify any allegations that may have been made concerning me in the past several weeks. I previously had instructed my accountant to make all his records available to you. I gave your investigators a very comprehensive statement as early as this morning and turned over any records that I had to them for any verification of any facts, and I shall try to answer any questions that may be propounded to me as truthfully and as conscientiously as I possibly can.

"Thank you very much."

Panagoulis then testified that this was "the same statement that I have made to Grand Juries for the past twelve years at least twice a year when I was called in there for discussion of general conditions." Here, however, there was a difference: In his previous appearances, Panagoulis had testified as chief of the county's police force. In this appearance, he was testifying

about a matter in which he had a direct, and very personal interest. Whether he was motivated by a desire to be helpful, whether this was an exculpatory endeavor, or whether he believed that he was under some compulsion to appear remains conjectural. He remained, in fact, for some two hours after making the opening statement, apparently answering questions posed by the jurors.

The lower court, in an effort to preserve the inviolate character of the grand jury proceedings, see *United States v. Johnson,* 337 F. 2d 180 (4th Cir. 1964) *aff'd* 383 U. S. 169, 86 S. Ct. 749, 15 L.Ed.2d 681 (1966) ; *United States v. Johnson,* 215 F. Supp. 300 (D. Md., 1963) ; *United States v. Amazon Industrial Chemical Corp.,* 55 F. 2d 254 (D. Md., 1931) ; *Piracci v. State,* 207 Md. 499, 115 A. 2d 262 (1955) ; *Bernard v. Warden of Md. House of Correction,* 187 Md. 273, 49 A. 2d 737 (1946), declined to admit the transcript of the remainder of Panagoulis' testimony into evidence. This lay within its sound discretion. *United States v. Scott Paper Co.,* 254 F. Supp. 759 (W. D. Mich. 1966). The testimony was apparently read by the court, however, which concluded:

> "Concededly [Panagoulis] went before the grand jury when they were investigating a matter concerning zoning and in which his name was at least involved, and it was out of that investigation that this indictment resulted. So that I have no difficulty in finding as a fact that the two are together. * * * He was there to testify in connection with the investigation that they in fact were making of certain allegations that had been made and with which his name had been associated."

The controlling statutes are found in Code, Art. 27, §§ 23 [2]

---

**2.** Originally enacted on 30 March 1868 as Ch. 369 of the Laws of 1868 in compliance with Constitution of Maryland (1867) Art. III § 50:

> "It shall be the duty of the General Assembly, at its first session, held after the adoption of this Constitution, to provide by Law for the punishment * * * of any person, who shall bribe, or attempt to bribe, any Executive, or Judicial officer of the State of Maryland, or any mem-

and 39, which have been held to apply to testimony before a grand jury. *Brown v. State,* 233 Md. 288, 196 A. 2d 614 (1964), § 23, which makes it a crime to bribe or attempt to bribe any State, county or municipal officer or employee, provides, in part:

"*  *  * [A]ny person so bribing or attempting to bribe or so demanding or receiving a bribe shall be a competent witness, and compellable to testify against any person or persons who may have committed any of the aforesaid offenses; provided, that any person so compelled to testify in behalf of the State in any such case shall be exempt from prosecution, trial and punishment for any such crime of which such person so testifying may have been guilty or a participant therein, and about which he was so compelled to testify."

§ 39 extends the immunity to cases involving conspiracy:

"No person shall refuse to testify concerning the crime of conspiring to commit any of the offenses set forth in § 23 of this article, subtitle 'Bribery' ['Bribery; Obstructing Justice'] or set forth under the subtitle 'Gaming' of this article or set forth under the subtitle 'Lotteries' of this article, and any person shall be a competent witness and compellable to testify against any person or persons who may have conspired to commit any of the aforesaid offenses, provided that any person so compelled to testify in behalf of the State in any such case, shall be exempt from prosecution, trial and punishment for any and all such crimes

ber, or officer of the General Assembly of the State of Maryland, or of any Municipal corporation in the State of Maryland * * *; and, also, to provide by Law for the punishment, * * * of any of said officers, * * * who shall demand, or receive any bribe, * * *; and, also, to provide by Law for compelling any person, so bribing, or attempting to bribe, or so demanding, or receiving a bribe, fee, reward, or testimonial, to testify against any person, or persons, who may have committed any of said offenses; Provided that any person, so compelled to testify, shall be exempted from trial and punishment for the offense, of which he may have been guilty; * * * "

and offenses of which such person so testifying may have been guilty or a participant or a conspirator therein and about which he was so compelled to testify."

Article 22 of the Maryland Declaration of Rights and the Fifth Amendment to the Constitution of the United States provide that no person shall be compelled to be a witness against himself.[3] The two statutes under consideration make a witness compellable to testify against himself and thus deny him the privilege against self-incrimination provided by our Declaration of Rights and the Constitution of the United States. In return, the statutes confer upon that witness an immunity from prosecution. Such statutes are valid only if the protection afforded is as broad as the privilege that has been removed. The statutes here considered have been found to afford sufficient protection. *Brown v. State, supra,* 233 Md. at 297.

It is quite clear that the statutes equate immunity with compulsion, but it is equally clear that a witness, although *compellable,* gains no immunity unless he is *compelled.* The simple issue is, therefore, whether Panagoulis was, under the facts before us, *compelled* to testify. In a highly technical sense, we think he was. Although his initial appearance before the grand jury was entirely voluntary, as was his explanatory statement, once this had been completed, he was under the same compulsion as would have been the case had he appeared in response to a subpoena. Had he been dismissed at the conclusion of his voluntary statement, we might take a different view of the matter; but he was not, and remained for what appears to have been an extensive interrogation on matters which the trial court found to be directly related to his subsequent indictment.

---

**3.** As the lower court pointed out:

"In *Malloy v. Hogan,* 378 U. S. 1, the Supreme Court held that the protection of the federal constitution's privilege against self-incrimination flowed to the states through the Fourteenth Amendment. But even before the decision in that case, the Court of Appeals of this State, in *Brown v. State, supra,* held that the two constitutional provisions against self-incrimination were in *pari materia* and should receive a like construction." 3 Md. App. at 337.

This conclusion is not at variance with the prior decisions of this Court. In *State v. Comes,* 237 Md. 271, 206 A. 2d 124 (1965), Comes, a Baltimore County road superintendent made two appearances before a grand jury investigating possible violations of law regarding the sale of bituminous materials to the county. On both occasions, Comes appeared, not in response to a subpoena, but in answer to radioed instructions sent by a dispatcher to him "in the field". As a result of his testimony Comes was indicted. He moved to dismiss the indictments, relying on the immunity granted by Code, Art. 27, § 23. The State argued that Comes had appeared voluntarily, and that not having been compelled to testify, he could not clothe himself in the cloak of immunity.

Judge (later Chief Judge) Prescott, speaking for the Court, said that the case posed two questions, both of which were answered in the negative: (1) Is a subpoena an indispensable factor in compelling a witness to testify?; and (2) Under [Art. 27 § 23] must a witness claim his privilege in order to obtain the exemption afforded by the statute?

As to the first question, the Court said:

> "* * * Every person is presumed to know the law; hence, [Comes], once he got before the grand jury whether by subpoena or otherwise, presumptively knew that he was subject to contempt proceedings and imprisonment, if he refused to answer questions relative to the bribery laws." 237 Md. at 278,

and quoted *Sullivan v. Sullivan,* 234 Md. 67, 197 A. 2d 910 (1964): "Acquiescence to or assent to what one cannot prevent does not amount to a voluntary agreement thereto." at 73.

The opinion concluded:

> "In making this ruling, we are not to be understood as intimating that no witness, who appears before a grand jury and testifies, may not do so 'voluntarily.' Instances have been known where witnesses, either by subterfuge (such as a witness using another witness' subpoena), collusion, or otherwise, have appeared before grand juries and testified for the specific

purpose of attempting to obtain immunity. No such question is raised herein (and we leave all questions of this nature open) ; * * *." 237 Md. at 282.

In the case before us, the lower court found:

"* * * as a fact * * * that there is no testimony to substantiate that there was any such ruse or idea in Panagoulis' mind to get before the grand jury to gain some immunity. As a matter of fact, I am inclined to think that as an actual matter he didn't know that there was an immunity provision in the statute, * * *. So I find conclusively as a fact that there was no such, to use Judge Prescott's words, 'subterfuge, collusion' or the like to get in the grand jury room for the sole purpose of obtaining immunity. I have no question that his hope in going before the grand jury was to help himself, but that is not what we are talking about. We are talking about the purpose, not to help himself but only to gain immunity. Of course that would help him, but I think that his purpose was hopefully to persuade them that this didn't warrant an indictment being returned and not for the purpose of bringing it within the statute."

We do not intend that this case can be taken as authority for the proposition that one who contrives to get before a grand jury to testify can later cloak himself with the immunity accorded by § 23. It should be remembered that even if Panagoulis did not appear at the direction or request of the state's attorney, arrangements for his appearance were made by the state's attorney. It is well settled that one who is being investigated by a grand jury has no right, constitutional or otherwise, to appear before that body, *United States v. Thompson,* 144 F. 2d 604 (2d Cir. 1944) *cert. den.* 323 U. S. 790 (1944) ; *Duke v. United States,* 90 F. 2d 840 (4th Cir. 1937) *cert. den.* 302 U. S. 685; *Brack v. Wells,* 184 Md. 86, 40 A. 2d 319 (1944) ; *Watson v. Warden,* 2 Md. App. 134, 140, 233 A. 2d 321 (1967) and that it has been held that one who solicits the grand jury to. allow him to testify in his own defense may be

held in contempt. *Hitzelberger v. State,* 173 Md. 435, 196 A. 288 (1938) ; *Watson v. Warden, supra,* 2 Md. App. at 140; *Commonwealth v. McNary,* 246 Mass. 46, 140 N. E. 255, 256 (1923). Under the facts of this case, we cannot say that Panagoulis' conduct mounted up to a waiver of the immunity conferred by statute.

> *Order affirmed; costs to be paid by appellant.*